## SHIPBOARD EMPLOYMENT AGREEMENT

This agreement (this "Agreement") is entered into in the city of NEW YORK country of USA on this 31ST MARCH 2022, to be effective on 10TH APRIL 2022 (the "Effective Date") between OneSpaWorld (Bahamas) Limited, a Bahamas international business MARIA ISABEL RODRIGUEZ PALACIO citizen of COLOMBIA, with an address at TRANS 32D #74C - 5 BELEN ALAMEDA, MEDELLIN, ANTIOQUIA, 050031(date of birth: 06/11/1977 place of birth: MEDELLIN COLOMBIA (hereinafter referred /to as the "Employee") (the Company and Employee are referred to in this Agreement, collectively, as "the Parties"). /As used in this A/greement, "Affiliates" means a company controlled by, under common control with or controlling the Company.

1.    Employment, Generally

(a)    The Company hereby employs Employee and Employee hereby accepts employment by the Company on any vessel designated by the Company, subject to the terms and conditions of this Agreement, including as this Agreement may be modified by agreement of the Parties. The compensation to be paid to Employee under this Agreement and the designation of the position to be held by Employee shall be set forth in the Position and Compensation Addendum to this Agreement (the "Addendum") provided to Employee at the time Employee was provided with this Agreement for review. The Addendum shall constitute a part of this Agreement as if it were included in this Agreement. In this Agreement, the term "Vessel" (when capitalized) refers to the vessel on which Employee is serving, or which Employee is proposed to serve, as the case may be, at the time in question pursuant to this Agreement.

(b)    This Agreement shall continue to have effect while an Employee is held captive on or off the ship as a result of acts of piracy or armed robbery against ships, regardless of whether the date fixed for its expiry has passed or either of the Parties has given notice to suspend or terminate it. For the purpose of this Section 1(b), the term: (i) piracy shall have the same meaning as in the United Nations Convention on the Law of the Sea, 1982; (ii) armed robbery against ships means any illegal act of violence or detention or any act of depredation, or threat thereof, other than an act of piracy, committed for private ends and directed against a ship or against persons or property on board such a ship, within a State's internal waters, archipelagic waters and territorial sea, or any act of inciting or of intentionally facilitating an act described above.

2.    Period of Employment

The period of Employee's employment under this Agreement, for all purposes, including but not limited to, with respect to the Company's obligations to provide reimbursement of medical expenses and other obligations set forth herein related to the health and welfare of Employee, shall commence on the date when Employee signs on to the Vessel to which Employee is first assigned by the Company after Employee's execution of this Agreement, and, subject to earlier termination as provided elsewhere in this Agreement, such period of employment shall continue for a period of 271 days after such date of commencement, subject to earlier termination as

provided in this Agreement.  Among other things, this Agreement shall be deemed terminated if Employee disembarks the Vessel other than to visit a port of call at which the Vessel is visiting where Employee returns to the Vessel prior to the Vessel's departure from that port of call.  Employee shall perform the services to be performed by Employee under this Agreement in the Company's spa, salon or fitness facility, as the case may be (including on assignment for any such facility outside of such facility), on the Vessel (these facilities are collectively referred to in this Agreement as the "Spa").

3.      **Compensation; Leave; Employee Obligations**

(a)      As compensation for the services provided by Employee under this Agreement, the Company shall pay to Employee the Compensation specified in the Addendum; provided that the compensation set forth in the Addendum may be changed by the Company at any time during the term of this Agreement upon seven days' notice and if Employee does not consent to the change, Employee's employment can be terminated at the end of such seven-day period.

(b)      Employee acknowledges that the payment of any gratuity or tip in connection with any aspect of Employee's services under this Agreement is in the sole discretion of the guest and Employee has no entitlement to any gratuities or tips unless such gratuity is actually paid with respect to a service performed by Employee.  Employee agrees that any claims by Employee for unearned wages under this Agreement or otherwise shall not include a claim for gratuities or tips.

(c)      Employee agrees that the Company is entitled to withhold from all compensation that may be paid to Employee under this Agreement any amounts that the Company is required to withhold pursuant to any applicable laws, rules, regulations or administrative orders of any governmental authority concerning any taxes which may be imposed with respect to Employee's compensation.  The Company shall inform Employee of the nature of such deductions.  Irrespective of the right of the Company to withhold amounts pursuant to this Section 3(c), it shall remain the responsibility of Employee to declare and pay all taxes and any other charges whatsoever due to any governmental authorities or other authorities in connection with Employee's income under this Agreement.

(d)      Employee is eligible for leave with pay of Employee's monthly Base Pay (the "Base Pay") based on the rate of 3.5 calendar days per 30 days of service and, in addition, is eligible to receive one day of holiday pay per 30 days of service.  Amounts representing the applicable pro rata payment for such annual leave and holiday days will be included in each compensation payment made to Employee and will be reflected in the documentation for such compensation payment.  Justified absences from work shall not be considered as leave.

(e)      Employee shall be provided with an account of the payments due and the amounts paid, including wages, any additional payments and the rate of exchanged used, if applicable, no less frequently than once each month.

(f)      Records with respect to overtime worked by Employee shall be maintained by the Company on at least a monthly basis on board the applicable Vessel and endorsed by Employee.  These records shall be consistent with the record of Employee's rest hours.

(g)      Any absence from work to attend a training course approved or required by the Company or for such reasons as illness or injury shall be counted as part of the period of service.  The following shall not be counted as part of leave with pay:

(i)         public and customary holidays recognized as such in the Bahamas whether or not these fall during the annual leave with pay;

(ii)        periods of incapacity for work resulting from illness or injury;

(iii)       temporary shore leave granted to a seafarer while under an employment agreement; and

(iv)       compensatory leave of any kind.

(h)      Employee shall be responsible for the timely payment of costs designated as Employee's responsibility under this Agreement, including, without limitation, the expenses listed below in this Section 3(h) (collectively, the "Employee Expenses").  In the case of required documentation, such documentation must be provided at Employee's expense to the Company together with translations, certified documents or other copies as required by the Company.  The following Employee Expenses are required to be paid by Employee:

(i)         pre-employment medical costs;

(ii)        valid medical certificate, issued by a medical practitioner provided or approved by the Company;

(iii)       valid passport;

(iv)       valid police clearance certificate;

(v)        Seaman's Book;

(vi)       The uniform prescribed by the Company for the position held by Employee, up to an expenditure of $_____ (the expense will vary depending on the nature of Employee's position); and

(vii)      transportation costs of Employee incurred in connection with and prior to joining the Vessel to which Employee is assigned, including, without limitation, costs associated with or related to flights, ground transport, accommodations, and meals.

Employee acknowledges and agrees that, in the event the Company makes payments on behalf of Employee in connection with any of the Employee Expenses, Employee shall reimburse the Company for the entirety of such payments through deductions from the

Control No. 0813/003
Version 17

compensation payable to Employee under this Agreement, in accordance with the procedures for repayment of Fees, as described in Section 3A, below.

(i)       In the event Employee is held captive on or off the ship as a result of acts of piracy or armed robbery against ships, wages and other entitlements under this Agreement shall continue to be paid during the entire period of captivity and until Employee is released and duly repatriated or, in the event Employee dies while in captivity, until the date of death as determined in accordance with applicable national laws or regulations.

3A.    **Repayment of Certain Fees From Your Compensation**

(a)       As Employee has been previously informed, Employee is required to pay (i) certain fees to the Company for the training (the "Training") Employee was provided by one or more companies affiliated with the Company (referred to in this letter as the "Company Fees"); and (ii) certain additional fees for training Employee was required to undertake in connection with the Training, which was provided by third parties including, but not limited to, training that you may be provided pursuant to the International Convention on Standards of Training, Certification and Watchkeeping for seafarers (referred to in this letter as the "Third Party Fees" and together with the Company Fees, referred to as the "Fees"). If Employee has been informed that Employee is entitled to postponement of the payment of any of the Fees, those postponed Fees are required to be repaid by Employee through deductions from the compensation payable to Employee under this Agreement. Such deductions will be made in equal amounts from the compensation payable to Employee during the first six months of Employee's employment under this Agreement. To the extent that Employee's employment under this Agreement terminates prior to the aforesaid six-month period, other than as a result of termination by the Company permitted under this Agreement, then Fees still owed by Employee to as of the date of such termination of employment shall be collected in full by the Company from any compensation payments remaining due to Employee under this Agreement at such time. To the extent that the less than all of the Fees still due to Employee are recovered by the Company pursuant to the deductions described above in this Section 3A, Employee will remain liable for such amount nonetheless and is required to make payments to the Company in full of such amounts no later than one year from the date that Employee commenced the Training.

(b)       Employee agrees that if, within two years from the date that Employee commenced employment with the Company (irrespective of the date that Employee's employment with the Company under this Agreement commenced) (the "Commencement Date"), Employee voluntarily terminates Employee's employment with the Company or if Employee is terminated by the Company pursuant to Section 10(a), below, Employee will repay to the Company the expenses incurred by the Company in connection with (i) all aspects of the training of Employee related to the services to be performed by Employee on the Vessel and safety or similar certifications (collectively, the "Training Courses"), (ii) certificates reflecting completion of the Training Courses, and (iii) lodging and food for

Employee during the Training Courses and transportation of Employee to the first vessel on which Employee serves on behalf of the Company after the Commencement Date, pro-rated based on the amount of time remaining in the term of this Agreement (the "Expenses"). The amount of the Expenses and the time when the Expenses are to be repaid to the Company are set forth on Exhibit "A" attached hereto. For the avoidance of doubt, Employee shall not be required to repay the Company the Expenses if Employee's employment is terminated by the Company other than pursuant to Section 10(a), below. At the option of the Company, repayment of the Expenses may be deducted from any regular or other payment otherwise due to Employee from the Company.

4.  **Medical and Death - Related Benefits**

Employee shall be entitled to the following benefits, subject to all the terms and conditions of this Agreement:

(a)     If Employee becomes ill or injured while in the service of the Vessel, which illness or injury does not come within the exclusions described in Section 5, below, the Company shall reimburse Employee for Employee's maintenance and cure expenses, as required by applicable law ("Maintenance and Cure"). In the event that Employee's employment terminates due to illness or injury, then, in addition to the benefits described in the immediately preceding sentence, the Company shall pay to Employee all compensation that was earned by Employee prior to such illness or injury, but not paid as of the date of termination of employment, plus an amount equal to the Base Pay payable to Employee for the balance of the voyage during which the illness or injury occurred ("Medical Unearned Wages"). In the event that Employee becomes ill or suffers an injury, Employee shall continue to receive Employee's Base Pay, as specified in the Addendum, as long as Employee is onboard the Vessel on which Employee was working prior to such illness or injury.

(b)     When employee is on a Vessel, unless an emergency requires otherwise, prior to Employee seeking medical assistance on shore, Employee shall first seek such medical assistance from the physician onboard that Vessel. By way of example, and not limitation, in the event Employee is excused by the Company from duty due to illness or injury, the Company may require, in its discretion, that medical treatment be provided to Employee onboard the Vessel by the Vessel's physician or ashore in either the Vessel's home port, a regular port of call, in Employee's country of residence or any other location where adequate medical care can be provided. The cost of medical treatment for Employee, when that Employee is on a Vessel or in a port of call of such Vessel, shall be at the expense of the Company. If Employee requires medical treatment ashore and is medically fit to travel, Employee agrees that all medical care and treatment will be administered in the Employee's country of residence this Agreement shall be terminated as of the date that Employee disembarks the Vessel. If Employee receives care in Employee's country of residence, Employee shall be entitled to receive $15 per day payable monthly in arrears until the earlier of the date (i) on which Employee ceases to be medically unfit for duty under this Agreement or (ii) on which Employee achieves "maximum medical improvement" as that term is defined under applicable maritime

law and rules; provided, however, that, notwithstanding the foregoing, whether or not the occurrences described in clauses (i) and (ii), above, arise, such payments shall not be required to be made for a period greater than sixteen (16) weeks.

(c)    The Company shall pay for reasonable burial expenses up to the sum of US $1,500.00 of an Employee who dies while employed by the Company under this Agreement, except to the extent such expenses are assumed by governmental authorities.

(d)    Employee shall be entitled to essential dental care while working on aboard a Vessel.

(e)    The estate of Employee (as specified pursuant to applicable law) shall be entitled to receive the sum of US$15,000 if Employee dies or suffers a long-term disability while employed by the Company under this Agreement.

(f)    The Company shall provide to Employee a personalized fitness and wellness program for Employee to follow.

(g)    Employee shall be entitled to "Friends and Family" discounts on the Company's spa services and "Employee" discounts on the Company's products.

5.    <u>Exclusions</u>

Notwithstanding the foregoing, the Company shall not be required to provide Maintenance and Cure or Medical Unearned Wages to Employee under any of the following circumstances or for the indicated treatments, as the case may be:

(a)    Illness, injury, or death, which occurs other than during the term of this Agreement;

(b)    Illness, injury, or death resulting from Employee's, drug, substance or alcohol use;

(c)    Any sexually transmitted diseases, including, but not limited to, HIV or AIDS;

(d)    Injury incurred otherwise than in the service of the Vessel;

(e)    Injury or sickness due to the willful misconduct of Employee;

(f)    Sickness or infirmity intentionally concealed at the time that Employee's employment under this Agreement commenced;

(g)    Any illness or injury not disclosed in connection with any medical history or medical questionnaire responses provided to the Company, including any medical conditions;

(h)    Pregnancy;

(i)    Any diagnosed permanent condition or incurable disease; and

(j)    Any other exclusions or limitations with respect to Maintenance and Cure or Medical Unearned Wages to which the Company is entitled as a matter of law.

(k)    Employee is required to immediately notify the Company in writing of any illness, injury or other medical condition which becomes known to Employee after each pre-employment medical evaluation ("PEME") of Employee, and prior to the next PEME,

and in any event before Employee executes any additional shipboard employment agreement with the Company or any of its Affiliates. Failure to provide such updated medical information to the Company shall relieve the Company from any obligation under this Agreement or otherwise to provide benefits of any kind to Employee in connection with any such undisclosed medical condition.

6.   **Transfer Between Vessels**

(a)   Employee's place of employment shall be on any vessel designated by the Company, and the Company shall have the right to transfer Employee from one vessel to another at any time during the term of this Agreement with such advance notice as determined by the Company in its sole discretion. The Company shall be responsible for Employee's expenses of transportation between such vessels as a result of a transfer by the Company, as provided in the Reimbursement Rules. In connection with any such transfer between Vessels, the Base Pay payable to Employee as set forth in the Addendum shall continued to be paid during such transition.

(b)   Employee may request in writing a transfer to another vessel; provided, however, that Employee shall have no right to transfer from one vessel to another and any such transfer, if granted, would be made in the sole discretion of the Company. If such request is granted, the cost of the transfer shall be entirely the responsibility of Employee. No request for a transfer from one vessel to another by Employee will be considered by the Company if this Agreement is the first agreement that Employee has with the Company to serve on a Vessel.

7.   **Vessel Out of Service**

If the Vessel on which Employee is employed is removed from service for maintenance for any other reason or if such Vessel is operating for all or a portion of a voyage in a manner such that no revenue is generated in the Spa (any of such periods of time is referred to as a "Non-Work Period") then, during any such Non-Work Period, the Company shall provide compensation to Employee at a rate that is the lesser of Twelve Dollars (US$12.00) per day and the rate that would be applicable based on the minimum monthly compensation then payable to Employee under this Agreement. If any Non-Work Period exceeds 14 days, the Company may elect, at its sole option, to terminate this Agreement upon seven (7) days written notice to Employee, after which seven-day period Employee will not be entitled to receive any payments or benefits of any kind under this Agreement, except that Employee shall be entitled to receive unpaid compensation earned by Employee and unpaid as of the end of such seven-day period and the repatriation expenses described in Section 10, below. During this time the Employee can be called upon at any time to join another vessel if required and, therefore, must always be available. Notwithstanding the foregoing, Employee may make a request to the Company that during a Non-Work Period Employee take a leave of absence for a specified period of time from the Vessel. The Company may, in its sole discretion, agree or not agree to grant such request for a leave of absence from the Vessel or may grant the leave of absence for a period of time less than that requested by Employee. In the event that Company grants Employee's a request for a leave of absence from the Vessel

during such a Non-Work Period, Employee acknowledges that Employee will not receive any compensation or benefits of any kind (including, but not limited to, any insurance coverage) during such leave of absence. Any travel and other expenses that may be incurred by Employee during any leave of absence granted pursuant to this <u>Section 7</u> shall be the sole responsibility of Employee and neither Company nor the Vessel nor the owner of the Vessel shall be liable for any personal belongings of Employee left on the Vessel during such leave of absence. If a leave of absence during a Non-Work Period is granted to Employee pursuant to this <u>Section 7</u>, upon Employee's return to the Vessel, Employee's employment under this Agreement shall continue pursuant to the terms of this Agreement and this Agreement shall not be extended beyond the expiration date of the Agreement described in <u>Section 2</u>, above.

8.      **Employee's Responsibilities**

Employee at all times shall be subject and directly responsible to the Company's manager of the Spa on the Vessel in question (the "<u>Manager</u>"), who shall designate the hours during which Employee shall perform services, the specific duties to be performed by Employee and other details of Employee's employment on the Vessel. The specific duties to be identified by the Manager to Employee shall include all such duties as determined appropriate by the Manager for the efficient and effective performance of the Company's operations on the vessel, including duties outside the area of Employee's specialization or training, including, but not limited to promotional and reception duties, cleaning of the Company's facilities, attendance at staff meetings and training (including training on land), and performing stock inventories. Notwithstanding the foregoing, Employee shall not be required to work more than 14 hours in any 24- hour period or more than 70 hours in any seven-day period and the minimum hours of rest for Employee shall not be less than ten hours in any 24-hour period and 77 hours in any seven-day period. Employee shall have no other employment during the term of this Agreement. Employee shall obey the directions of the Manager and shall perform Employee's duties efficiently, effectively and otherwise in a manner satisfactory to Manager. In addition, Employee shall be subject at all times to the authority and instructions of the Vessel's Master and shall comply with all requirements of the Vessel's ships articles, regulations and codes of conduct and all applicable maritime laws and regulations and other laws and regulations. Employee will be personally responsible for the costs of any financial loss, damage or injury to the Company, the Vessel, any property thereon, or any individual caused by Employee's negligence or willful misconduct and Employee agrees to indemnify and hold harmless the Company and its Affiliates and the respective officers, directors, employees, agents and representatives of the Company and such Affiliates for any claims, expenses or liability to which the Company, such Affiliates or such individuals may be subject as a result of such damage or injury caused by Employee. Employee also shall comply at all times with the Company's employee handbook (referred to in this Agreement as the "<u>Employee Handbook</u>") and Employee acknowledges receiving and reviewing the Employee Handbook prior to signing this Agreement.

9.      **Medical Examination; Termination; Personal Effects**

(a)     Employee shall, from time to time, upon demand by the Cruise Line operating the Vessel or the Company, undergo medical examinations and/or drug testing by a duly qualified medical practitioner approved by such Cruise Line or the Company, as the case may be.  If, as a result of the a medical examination of Employee, the Company or the Cruise Line finds that Employee is suffering from any medical condition likely to be aggravated by service at sea, rendering Employee unfit for service under this Agreement or which may endanger the health or safety of other persons on board, the Company shall notify Employee to that effect in writing and this Agreement shall be terminated as of the date determined by the Company or such Cruise Line, as the case may be.

(b)     In the event that Employee is deceased or incapacitated ashore, the Company will secure in safety Employee's belongings and forward them to Employee's family or as otherwise directed by Employee.

10.     **Termination; Repatriation; Certain Payments**

(a)     The Company shall be entitled to terminate Employee's employment under this Agreement upon seven (7) days notice to Employee in the event of a Serious Default (as defined in Section 10(h), below) or other breach by Employee of its obligations under this Agreement, a breach by Employee of Employee's obligations under the Employee Handbook or any other conduct of Employee which allows the Company to terminate Employee's employment under applicable law.  Notwithstanding the foregoing, in the event that the Company determines that it is in its best interest to provide to Employee less than seven (7) days notice of termination of employment under this Agreement, then Company shall be entitled to give such notice as it deems appropriate under the circumstances, provided that Employee receives Employee's Base Pay for a seven (7) day period in connection with any such termination.

(b)     If Employee desires to terminate this Agreement prior to the expiration of this Agreement, then Employee shall give the Company no less than seven (7) days notice of such termination and the Company shall permit Employee to disembark at the next port reasonably deemed appropriate by the Company for such disembarkation, but in no event shall such disembarkation take place more than 30 days after the date of such notice by Employee.  Upon receiving such notice, the Company may determine, if it so chooses in its sole discretion, to cause such termination to be effective at any time prior to the end of such seven-day notice period.

(c)     If the Company desires to terminate this Agreement prior to the expiration of this Agreement, then Company shall give Employee no less than seven (7) days notice of such termination and the Company shall permit Employee to disembark at the next port deemed appropriate by the Company for such disembarkation.  Upon receiving such notice, the Employee may determine, if Employee so chooses in its sole discretion, to cause such termination to be effective at any time prior to the end of such seven-day notice period.

(d)     The Company will pay, in accordance with the Company's expense reimbursement rules (hereafter referred to as "Reimbursement Rules") set forth in the Employee Handbook (plus the cost of one piece of baggage weighing thirty (30)) kilograms or

less), the expenses of Employee in traveling from the port of disembarkation to a city selected by the Company in Employee's country of residence (referred to in this Agreement as the "Gateway City") in the following circumstances:  (i) upon the completion of the full term of this Agreement (**271** days), (ii) if Employee is no longer able to carry out Employee's duties under this Agreement or cannot reasonably be expected to carry out such duties under the circumstances, including but not limited to illness, injury or incapacity in accordance with Section 9, above, or otherwise, (iii) this Agreement is terminated under Sections 7, above, or 11, below, (iv) if this Agreement: (A) expires while Employee is aboard the Vessel; (B) is terminated by the Company not based on a breach by Employee of Employee's obligations under this Agreement; or (C) is terminated by Employee upon seven (7) days notice as a result of a material breach of this Agreement by the Company, (v) in the event of illness or injury or other medical condition which requires Employee's repatriation when found medically fit to travel; (vi) in the event of shipwreck involving the Vessel on which Employee is serving, plus, in such instance, the value of lost personal property up to US $2,500; (vii) in the event of the Company not being able to continue to fulfill its legal obligations to Employee by reason of insolvency or similar reason; or (viii) in the event of the Vessel in question being bound for a war zone, as defined by applicable law, to which the Employee does not consent to go.  Employee acknowledges and agrees that the Company's obligations pursuant to the Reimbursement Rules shall be fulfilled in their entirety immediately upon Employee's arrival in the Gateway City, and that any and all costs incurred by Employee commencing immediately after Employee's arrival in the Gateway City shall be the sole responsibility of Employee.  For purposes of clarity, in the event the Company advances the amount of any such costs to Employee, the Company shall be entitled to recover the entire amount of such advance from Employee.

(e)     If (i) Employee terminates Employee's employment under this Agreement prior to its expiration other than as a result of material breach of this Agreement by the Company or an Excused Resignation (as defined below in this Section 10(e)), (ii) Employee is terminated by the Company or by the cruise line operating the Vessel (referred to in this Agreement as the "Cruise Line") prior to the completion of a cruise for a Serious Default (as defined below in this Section 10), (iii) Employee's employment is terminated under Section 10(a), above or (iv) a representative of the Vessel or the Vessel operator requires that the employment of Employee under this Agreement be terminated or that Employee otherwise depart the Vessel, for justified reasons, then, (x) the Company shall have no responsibility for paying the expenses of repatriation of Employee to Employee's country of residence or anywhere else and Company shall be entitled to recover any travel expenses incurred by Company in the case of the termination referenced above in Section 2 and (y) Employee shall not be eligible for any future employment with the Company or any Affiliate, except that in the event that Employee's termination of employment is a result of the death or a serious illness involving Employee's mother, father, sister, brother, husband, wife or child and the Company receives documentation of such death or serious illness reasonably acceptable to the Company (an

"Excused Resignation"), then such ineligibility for future employment shall apply (although no guarantee of future employment is applicable to the Employee).

(f)      In the event Employee's employment with the Company is terminated pursuant to Sections 10(a) or (e), above, Employee shall not be entitled to receive any compensation or payment of any kind from the Company other than any unpaid compensation earned through the date of such termination as of the date of such termination of employment or as otherwise specifically provided in this Agreement.

(g)      If Employee's employment with the Company under this Agreement is terminated by the Company prior to the end of the 271 day term of this Agreement, other than pursuant to Section 7, above, as a result of a Serious Default and/or other breach of this Agreement as provided in Section 10(a) of this Agreement, then Employee shall be entitled to receive, within 15 days after the date of such termination, an amount equal to the unpaid Base Pay due to Employee through the expiration date of this Agreement.

(h)      In connection with the expiration or termination of this Agreement, the Company will notify Employee of the port and date of disembarkation from the Vessel on which Employee is employed, which will be the first port and date reasonably convenient to the Company after the end of (or, in some cases, during), the cruise during which the date of such expiration or termination, as the case may be, occurs.  In the sole discretion of the Company, in connection with the upcoming expiration of this Agreement, Company may determine to require Employee to disembark from the Vessel on which Employee is employed up to three weeks prior to the expiration date of this Agreement.  In the event of such required disembarkation prior to the expiration date of this Agreement, Company shall pay to Employee an amount equal to the Base Pay to which Employee would be entitled for the period remaining until the date of expiration of this Agreement.  In the event Employee is required to disembark up to three weeks after the date of expiration of this Agreement, the terms of this Agreement shall continue to apply for such up to three week period.

For purposes of this Agreement, "Serious Default" means a breach of this Agreement which would be deemed grounds for termination under applicable law.

(i)      Notwithstanding anything to the contrary contained herein, Employee's entitlement to repatriation may lapse if Employee does not claim it within a reasonable period of time to be defined by national laws or regulations or collective agreements, except where Employee is held captive on or off the ship as a result of acts of piracy or armed robbery against ships.

11.      **Other Permitted Terminations**

In the event that the Company loses the right to operate on the Vessel on which Employee is then serving, for any reason, or if the officers of the Vessel on which Employee is then serving or officers of the Cruise Line require that Employee cease working on the Vessel or disembark from the Vessel, the Company may terminate this Agreement on seven (7) days advance notice to Employee.

12.    **Notices**

Any and all written notices or other correspondence which either party provides to the other in connection with this Agreement shall be delivered as follows:

(a)    <u>Notice to Employee by the Company</u>.  If Employee is on a Vessel at the time of the notice or other correspondence from the Company, then such notice or correspondence shall be delivered to Employee by the Manager by personal delivery and shall be deemed received by Employee at the time of such personal delivery.  If Employee is not serving on a Vessel a the time of giving such notice or correspondence, then delivery shall be sent by recognized overnight courier such as UPS or FedEx (a "<u>Recognized Courier</u>") to Employee's last mailing address provided by Employee to the Company, or via email at the last email address utilized by Employee in communicating with the Company or the last email address identified to the Company by Employee as being the email address for Employee, as the case may be.  With respect to the latter manner of delivery described in the immediately preceding sentence, delivery shall be deemed given (i) when personally delivered, (ii) three (3) days after been deposited for delivery with the Recognized Courier and addressed to the address set forth in the beginning of this Agreement or to such other address as such party may designate in writing or (iii) upon successful transmission by email.

(b)    <u>Notice to Company by Employee</u>.  Delivery shall be made by personal delivery to the Manager addressed to the Company's Director of Human Resources, Maritime.

13.    **Confidentiality**

All references to the "Company" in this <u>Section 13</u> shall include all Affiliates where the context permits.

(a)    Employee acknowledges and agrees that (i) in the course of Employee's employment with the Company, it will be necessary for Employee to acquire information which could include, in whole or in part, information concerning the sales, products, services, customers and prospective customers, sources of supply, computer programs, system documentation, software development, manuals, formulae, processes, methods, machines, compositions, ideas, improvements, inventions or other confidential or proprietary information belonging to the Company or relating to the affairs of the Company (collectively, the "<u>Confidential Information</u>"), (ii) the restrictive covenants set forth in this <u>Section 13</u> are reasonable and necessary in order to protect and maintain such proprietary interests and the other legitimate business interests of the Company and that such restrictive covenants in this <u>Section 13</u> shall survive the termination of Employee's employment with the Company for any reason and (iii) the Company would not have entered into this Agreement unless such covenants were included herein.

(b)    <u>Non-Solicitation of Employees, Etc</u>.  Employee agrees that during Employee's employment with the Company and thereafter for a period of two (2) years, Employee shall not, directly or indirectly, as an individual or sole proprietor or as a principal,

agent, employee, employer, consultant, independent contractor, officer, director, shareholder or partner of any person, firm, corporation or other entity or group or otherwise without the prior express written consent of the Company, approach, counsel or attempt to induce any person who is then in the employ of, or then serving as an independent contractor with, the Company to leave the employ of, or terminate such independent contractor relationship with, the Company or employ or attempt to employ any such person or persons who at any time during the preceding six (6) months, was in the employ of the Company.

(c)     Non-Disclosure of Confidential Information.  Employee agrees to hold and safeguard the Confidential Information in trust for the Company, its successors and assigns and only use the Confidential Information for purposes of performing Employee's duties hereunder and agrees that Employee  shall not, without the prior written consent of the Company, misappropriate or disclose or make available to anyone for use outside the Company at any time, either during Employee's  employment hereunder or subsequent to the expiration of this Agreement or termination of Employee's employment hereunder for any reason, any of the Confidential Information, except as required in the performance of Employee's duties to the Company or as required by applicable law. In the event that Employee is requested or required by, or under applicable law or court, or administrative order to disclose any of the Confidential Information, Employee shall provide the Company with prompt written notice of any such request or requirement so that the Company may seek a protective order or other appropriate remedy. If Employee is legally compelled to disclose Confidential Information, Employee shall disclose only that portion of the Confidential Information which Employee is legally required to disclose.

14.     **Severability**

It is the intention of the Company and the Employee that any provision of this Agreement or the Addendum found to be invalid or unenforceable be reformed rather than eliminated.  If any provisions of this Agreement or any part hereof is construed to be invalid or unenforceable, the same shall not effect the remainder of the provisions of this Agreement, which shall be given full effect without regard to the invalid portions.  If any of the provisions of Section 13, above, or any part thereof, is found to be unenforceable because of the duration or the scope of such provision, the Company and the Employee agree that the tribunal making such determination shall have the power to modify the duration or scope or other terms of such provision and, as so modified, said provision(s) shall be enforceable.

15.     **Employee Data and Data Protection**.

The Company will collect and process information relating to Employee in accordance with the privacy notice which is contained in the Company's Data Protection Policy for Onboard Employees (the "Protection Policy"), and Employee acknowledges receiving and reviewing a copy of the Protection Policy prior to signing this Agreement.  Employee shall comply with the Protection

Policy when handling personal data of individuals in the course of Employee's employment, including, but not limited to, personal data relating to any employee, worker, contractor, customer, client, supplier or agent of the Company. In connection with the foregoing, and for the avoidance of doubt, Employee shall also comply with the Company's policies relating to Internet technology, communication systems, social media and bringing Employee's own devices to the workplace which are located in the Employee Handbook.

16.     **Governing Law; Dispute Resolution**

(a)     This Agreement shall be governed by the laws of The Bahamas.

(b)     Except as provided in the last two sentences of this Section 16(b), any and all disputes, claims, or controversies whatsoever, whether in contract, regulatory, tort or otherwise, including but not limited to, constitutional, statutory, common law, intentional tort and equitable claims, as well as Jones Act and Wage Act claims, claims for negligence, unseaworthiness, maintenance and Cure, failure to provide prompt, proper and adequate medical care, personal injury, death, or property damage and whether accruing prior to, during or after the expiration of this Agreement (collectively "Disputes"), shall be resolved by final and binding arbitration. In addition, Employee agrees to arbitrate any and all disputes regarding the existence, validity, termination or enforceability of any term or provision in this Agreement. All arbitration between the parties shall be referred to and finally administered and resolved in Nassau, The Bahamas and administered by the American Arbitration Association ("AAA") under its international dispute resolution procedures. The Company and Employee may initiate arbitration by the appropriate filing with the AAA. The number of arbitrators shall be one. The Arbitrator shall be a member of the bar of The Bahamas and mutually acceptable to Employee and the Company. If the Company and Employee cannot agree on an arbitrator, the AAA shall select the arbitrator pursuant to its applicable procedures, provided that the arbitrator so selected must be a resident of the Bahamas and a member of the Bar of the Bahamas. The language of the arbitral proceedings shall be English. Each Party shall bear its own attorney's fees and costs regardless of any laws to the contrary. At Company's request, Employee agrees to appear at Employee's expense for medical examinations by doctors designated by the Company in specialties relevant to any disputes between the Parties. If Employee is from the Philippines, all Disputes shall be governed by the terms of the Standard Philippine Overseas Employment Administration Contract of Employment ("POEA Contract") and the POEA Contract jurisdictional and venue terms shall supersede and take precedent over any conflicting terms set forth in this Agreement. If Employee is a United States citizen and the Company cannot mandate that a Dispute be subject to arbitration, Employee agrees that such Dispute shall be litigated, if at all, in the United States District Court for the Southern District of Florida, to the exclusion of the courts of any other state, territory or country or elsewhere in the State of Florida, including state court. Employee specifically waives any venue or other objection that Employee may have to any such action or proceeding being brought in the United States District Court for the Southern District of Florida.

Control No. 0813/00
Version 17
14

17.   **Non-Assignment; Successors; etc.**

The Company may assign any of its rights under this Agreement, but it may not assign any of its obligations under this Agreement without the prior written consent of Employee, which consent shall not be unreasonably withheld. This Agreement shall inure to the benefit of, and be binding on and enforceable by, the successors and assigns of the Company. The successors and assigns of the Company shall be bound by the terms hereof, and where the context permits, references to "Company" herein shall be deemed to apply to any such successors and assigns. Employee may assign Employee's rights, but not Employee's obligations, hereunder, and the obligations of Employee hereunder shall continue after the termination of Employee's employment with the Company for any reason and shall be binding upon Employee's estate, personal representatives, designees or other legal representatives, as the case may be ("Heirs"), and all of Employee's rights hereunder shall inure to the benefit of Employee's Heirs.

18.   **Entire Agreement; Certain Terms**

This Agreement, together with the Addendum, constitutes and contains the entire agreement of the parties with respect to the matters addressed herein and, as of the Effective Date, supersedes any and all prior negotiations, correspondence, understandings and agreements between the parties respecting the subject matter hereof.

19.   **Non-Waiver**

Failure by either the Company or Employee to enforce any of the provisions of this Agreement or any rights with respect hereto, or the failure to exercise any option provided hereunder, shall in no way be considered to be waiver of such provisions, rights or options, or to in any way affect the validity of this Agreement.

20.   **Headings**

The headings preceding the text of the paragraphs of this Agreement have been inserted solely for convenience of reference and neither constitute a part of this Agreement nor affect its meaning, interpretation or effect.

21.   **Counterparts**

This Agreement may be executed in two counterparts, each of which shall be deemed an original, but both of which together shall constitute one and the same instrument.

BY SIGNING THIS AGREEMENT, EMPLOYEE ACKNOWLEDGES THAT HE OR SHE SPEAKS AND READS ENGLISH, HAS HAD AN OPPORTUNITY TO SEEK ADVICE ON THE TERMS AND CONDITIONS HEREOF, HAS READ AND UNDERSTANDS THIS AGREEMENT, HAS RECEIVED AN EXPLANATION OF EMPLOYEE'S RIGHTS AND RESPONSIBILITIES UNDER THIS AGREEMENT, THE ATTACHED SCHEDULE AND WRITTEN COMMISSION STRUCTURE, AND IS ENTERING INTO THIS AGREEMENT FREELY AND INTENDS TO BE BOUND BY ITS TERMS.

Control No. 0813/00 15
Version 17

In witness whereof, the Company and Employee have signed this Agreement as of the date first set forth above.

SIGNED BY THE NAMES BELOW:

Employee hereby executes this Contract of Employment and confirms that Employee has reviewed and understood the provisions of this Agreement and of the Company Employee Handbook of OneSpaWorld (Bahamas) Limited.

_____
Employee Signature

_____
(Print Name)

ON BEHALF OF THE COMPANY:

OneSpaWorld (Bahamas) Limited:

By: _____

Name: _____

Title: _____

*Wage Addendum*
Version 10 - 3/16/22

| Cruise Line | NCL |
|---|---|
| Vessel Name | NORWEGIAN GETAWAY |
| Position Name | MASSAGE THERAPIST |

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| POSITION NAME | Monthly Basic Wage | Monthly Saturday/ Sunday Pay | Monthly Guaranteed Extraordinary Overtime | Monthly Leave Pay & Holidays | Total Basic Monthly Wage | Monthly Small Ship Supplement | Monthly Retainer | Commission Payout on Service Revenues | Commission Payout on Retail Revenues | Gratuity on Service Revenues (Approx.) | Minimum Monthly Compensation |
| MASSAGE THERAPIST | $36.40 | $15.17 | $15.17 | $7.56 | $74.30 | $0.00 | $0.00 | 0.00% | 9.00% | 18.00% | $800.00 |

All amounts are displayed in USD

If wages are paid in a non USD currency the exchange rate used to calculate wages will be specified on employees commission slip

Legend:

Numbers below correspond to numbered columns above

1 The position onboard and the work which is performed by the Employee

2 Monthly Basic Wage: 42 hours per Week

3 Monthly Saturday/ Sunday Pay: 14 hours per week

4 Monthly Guaranteed Extraordinary Overtime: 14 hours per week

5 Monthly Leave Pay & Holidays: 4.5 Days per Month

6 Total Basic Monthly Wage: column 2 + column 3 + column 4 + column 5

7 Monthly Small Ship Retainer where applicable

8 Monthly Retainer where applicable

9 No commission shall be payable on the first $50.00 of service revenues generated by the Employee during each day that employee is employed during  the pay period in question. *1
Auxiliary services may not be eligible for commission payouts

10 No commission shall be payable on the first $50.00 of retail revenues generated by the Employee during each day that employee is employed during  the pay period in question. *2

11 The gratuity amount on service revenues is subject to the guest's discretion. Gratuities may not be calculated on auxiliary services

12 Total compensation for Employee will not be less than $800 per month, which includes gratuities paid on services and alos includes leave and holiday pay.

Payment of commissions, gratuities, small ship supplements and other retainers,  if any (columns 7, 8, 9, 10, 11),  constitutes payment of the total basic monthly wage,
the requirements for which are set forth in columns 2, 3, 4 & 6.

Wages are paid at not less frequently than once per month, by direct deposit, into the Employee's Ocean Pay account.

Wages are paid into the Ocean Pay account of the Employee in US Dollars

When sailings of vessels are completed with Euro currency, wages are paid into the Employee's Ocean Pay account in Euros.

No pension benefits are paid to the Employee

Employee onboard during a dry dock/ wet dock is entitled to a monthly retainer of $365 ($12 daily)

Work visas to join  will be reimbursed to employee via staff transactions

Staff who sign an agreement with the POEA will be paid as per the terms of that agreement

*1 The aforesaid daily $50.00 of non-commissionable service revenue applies whether or not any revenue is, in fact, generated on a particular day.  If less than $50.00 in service revenue is generated on a particular day, then the difference between $50.00 and such lesser amount is carried forward and added to the $50.00 non-commissionable service revenue amount for the following day(s) until such amount and the $50.00 non-commissionable service revenue for the day(s) in question are fully utilized or the cruise in question terminates, if sooner.

*2 The aforesaid daily $50.00 of non-commissionable retail revenue applies whether or not any revenue is, in fact, generated on a particular day.  If less than $50.00 in retail revenue is generated on a particular day, then the difference between $50.00 and such lesser amount is carried forward and added to the $50.00 non-commissionable retail revenue amount for the following day(s) until such amount and the $50.00 non-commissionable retail revenue for the day(s) in question are fully utilized or the cruise in question terminates, if sooner.

The Employee confirms by Employee's signature below that Employee has read and understands this Wage Addendum to Shipboard Employment Agreement and agrees to its terms

Employee Name (print)     *Mirna Isabel Rodri...*          Company Representative Signature

Date     04-13-2022          Name and Title (print)     *ANOULU Halverhout*
*Spa Manager*

Vessel Name

Employee Signature

## ONESPAWORLD (BAHAMAS) LIMITED

## Shipboard Employment Agreement Extension

By executing this Shipboard Employment Agreement (the "SEA") Extension, the undersigned employee (the "Employee") and OneSpaWorld (Bahamas) Limited (the "Company") hereby agree that the SEA dated 04/10/2022 (Month/Day/Year) between the Employee and the Company will extend until 01/23/2023 (Month/Day/Year) (this "Extension").

The Employee and the Company hereby acknowledge that all of the terms and provisions of the SEA (other than the termination date of the SEA) shall continue to be in full force and effect during the term of this Extension.

BY SIGNING THIS AGREEMENT, EMPLOYEE ACKNOWLEDGES THAT HE OR SHE SPEAKS AND READS ENGLISH, HAS HAD AN OPPORTUNITY TO SEEK ADVICE ON THE TERMS AND CONDITIONS HEREOF, HAS READ AND UNDERSTANDS THIS Extension, AND INTENDS TO BE BOUND BY ITS TERMS.

In witness whereof, the Company and Employee have signed this Extension as of the date first set forth above.

_____
Employee Signature


_____
RODRIGUEZ PALACIO, MARIA (94989)


ON BEHALF OF THE COMPANY:
OneSpaWorld (Bahamas) Limited:
By: _____

Name and Title: SILVIA SOLERETO   SPA MANAGER